```
1  JAMES R. WILLIAMS, County Counsel (S.B. #271253)
   CHRISTOPHER A. CAPOZZI, Deputy County Counsel (S.B. #271583)
2  STEPHEN H. SCHMID, Deputy County Counsel (S.B. #78055)
   OFFICE OF THE COUNTY COUNSEL
3  70 West Hedding Street, East Wing, Ninth Floor
   San José, California  95110-1770
4  Telephone: (408) 299-5900
   Facsimile: (408) 292-7240
5

6  Attorneys for Defendant
   COUNTY OF SANTA CLARA
7
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
(San José Division)

| | |
|---|---|
| MICHEL HERMANGE,<br><br>            Plaintiff,<br><br>v.<br><br>COUNTY OF SANTA CLARA,<br><br>            Defendant. | No. 16-CV-02847-BLF<br><br>**DECLARATION OF SUSANA ALCANTAR IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION**<br><br>Date:   February 21, 2019<br>Time:   9:00 AM<br>Crtrm: 3, 5th Floor<br>Judge: Beth Labson Freeman |

I, SUSANA ALCANTAR, declare:

1. I have personal knowledge of the following facts described herein except those I state on information and belief, which I believe to be true. If called to testify, I could and would testify competently thereto.

2. I retired from Santa Clara County in 2012 after 37 years of service as a County employee.

3. At the time of Michel Hermange's employ with the Santa Clara County Probation Department from May – November 2010, I was a Program Manager with the Probation Department and I had worked in that department for 36 years at the time. I was the primary supervisor for Mr. Hermange.

///

1

4. Mr. Hermange's duties included scheduling and coordinating with different units to monitor vehicle usage and required maintenance; maintaining an inventory of vehicle items such as gas cards, garage passes, first-aid kits, spare tires, etc.; maintaining mileage records and reporting mileage to the Facilities and Fleet Department; reserving special vehicles for out of county trips for Department use; processing service calls for facilities, and appointments for county vehicle maintenance; assisting and correcting deficiencies cited in health and fire inspections; and maintaining the Probation Department buildings and facilities. Mr. Hermange was also responsible for turning in a monthly trend report which is a summary of his monthly activities. On Mr. Hermange's first day of work, I sat him down and counseled him regarding his list of assigned duties and provided him a copy of those assigned duties in writing. I explained that the Probation Department has a fleet of over 150 vehicles and serves 49 units or vehicle users. The fleet is used to transport probation officers, clients, youth offenders, and arrestees all over the County, as well as the State. These officers cannot be stranded somewhere because of a poorly maintained vehicle, and if they are stranded or have an incident, they need the proper equipment, including first aid kits, emergency repair equipment, roadside assistance contact information, gasoline cards, and accident reports. It is imperative that vehicles are well maintained, properly equipped, and regularly serviced.

5. During his employment I met with Mr. Hermange almost daily to provide him with hands-on training in tasks for which he was responsible. I would show him step-by-step how to complete documents related to his assignments and file them. I also demonstrated different processes and procedures related to his assigned tasks. I would always insist that he take notes while we went through this training. I also provided him with reference guides, manuals, written examples, and other documents that he could use to help him learn his job and develop proficiency in his routine tasks. I sought to show him how the Probation Department operated and the importance of how our unit served the needs of the department, which is a law enforcement agency. Mr. Hermange seemed to have little interest in reviewing the materials I provided, and based upon my follow up questions regarding those materials, it was clear that he had not looked at them. Despite this, I had a vested interested in his success in the position and I hoped that Mr. Hermange's work performance would turn around and he would help with the unit's significant workload. I

2

Declaration of Susana Alcantar in Support of Defendant's Motion for Summary Judgment, or in the Alternative, Summary Adjudication

16-CV-02847-BLF

needed him to be able to accomplish his assigned tasks. His success would in turn lead to less stress for my unit and better customer service for the Probation department.

6. In October 2010, Mr. Hermange changed the format of the department's Master Vehicle Log. I had specifically instructed Mr. Hermange not to change the report format. When I noticed the report had been changed, I asked him about it. Mr. Hermange first responded that he did not change the report format. Then he admitted that he "changed it a little bit." Mr. Hermange had moved the history portion of the report, and reordered the units, making the report difficult to read and use. This was a historical report that was kept by the department so that one could review an entire history of annual mileage, maintenance, and other incidents for each individual vehicle. The original format allowed the department managers and supervisors to not only evaluate each vehicle, it also allowed one to identify use and maintenance trends with different types of vehicles, as well as user trends. This report format was familiar to all managers in the Probation Department who used it. To change the format without notifying them in advance was not appropriate and not needed. Again Mr. Hermange failed to follow instructions and he was not truthful when asked if he had changed the format.

7. Mr. Hermange would frequently resist my instructions that he take notes. During one annual health and fire safety inspection in May 2010, I instructed Mr. Hermange to take notes on the items that the fire inspector pointed out. Mr. Hermange responded that it was not necessary because the fire inspector would provide us a written report. I explained that I wanted him to take notes so that he could begin working on the deficiencies right away. I told him that he absolutely needed to take notes during the inspection. Mr. Hermange responded that he thought it was a waste of time, but then he did begin to take notes. I reviewed his notes and they were scattered and unclear.

8. During the time that Mr. Hermange was employed at the Probation Department, he was unable to satisfactorily perform several of his assigned tasks, despite repeated training. To allow him to focus his efforts, I took his facilities responsibilities away for a month so he could focus on his fleet assignments. After a few months in the position and several training sessions, he failed to accurately record mileage in logs, he failed to file timely reports, and he failed to follow instructions and protocol for ordering, reserving, and equipping vehicles. He was trained in each of

3

Declaration of Susana Alcantar in Support of Defendant's Motion for
Summary Judgment, or in the Alternative, Summary Adjudication

16-CV-02847-BLF

these tasks repeatedly, yet he was either unable or in some instances, unwilling to perform the tasks in accordance with the standards and procedures required by the Probation Department. I conducted several retraining sessions to try to develop Mr. Hermange. It was critical that certain tasks be done correctly and accurately because they would impact the department budget. For instance, the monthly odometer or mileage report had to be done correctly because incorrect reports could result in erroneous charges to the department's budget. The reports also helped determine the timing of vehicle services, and therefore needed to be correct.

9. Mr. Hermange was repeatedly resistant to learning the processes for doing tasks. He would push-back against his training in several areas. At times when I would try to explain the reasons behind certain steps, Mr. Hermange would refuse to accept that they were necessary or proper for the task, and would often characterize them as a waste of time. When I would try to explain that certain steps were necessary because they would often feed information into other reports and processes, he was dismissive and stuck to his position that the work was unnecessary or redundant. In many instances he would resist taking notes, despite my instructions and insistence that he do so.

10. There were instances in which Mr. Hermange would skip steps in preparation of vehicle and mileage logs, leaving records incomplete and sorely lacking in required information. This was not a hard task to do correctly, but it was a time-consuming task, and Mr. Hermange simply seemed unwilling to put forth the effort to complete it correctly.

11. Mr. Hermange had great difficulty filing documents in a timely manner. Mr. Hermange routinely missed deadlines, and during his entire six-month tenure there was only one occasion when he notified me that he needed an extension before his deadline had already passed. He would question why certain reports had to be filed and repeatedly failed to file reports despite consistent reminders from me. He repeatedly missed deadlines, and when questioned he would reveal that he had not actually done the work because he felt it was unnecessary "busy" work. For instance, Mr. Hermange failed to submit both the September and October Fleet Inventory Reports on time. These reports were due the last week of each month, and Mr. Hermange failed to submit them on time in both September and October. He submitted each a week after they were due, and only

4

Declaration of Susana Alcantar in Support of Defendant's Motion for
Summary Judgment, or in the Alternative, Summary Adjudication

16-CV-02847-BLF

1  after I went and told him that he needed to submit them.

2        12.    On August 20, 2010, I told Mr. Hermange to contact each of the department's supervisors who were responsible for the vehicles assigned to their units to determine their vehicle needs for the next twelve months, and then submit a report to me. This report was necessary for the department's upcoming vehicle rotation scheduled for October 25, 2010, and it was critical that it be completed correctly and in a timely manner. Mr. Hermange missed his September 13, 2010 deadline to complete the report, so I extended the deadline to September 20, 2010. Mr. Hermange failed to submit the report on September 20, 2010, and I asked Mr. Hermange for the report on September 23, 2010. At that point he informed me that he had just started to contact the fleet users that day and I was very disappointed with his lack of progress and his lack of effort. I gave him one more extension to October 1, 2010 and emphasized that the department needed this report completed as soon as possible in order to plan the upcoming vehicle rotation. Mr. Hermange failed to complete the interviews and submit his report by the October 1, 2010 deadline. Instead, he turned in an incomplete report on October 4, 2010, having only interviewed and obtained information from 23 of the 49 vehicle users. I had to assign another person to contact the other 26 vehicle users and finish the project.

      13.    Mr. Hermange was often uncooperative, and obstinate in his interactions with me, especially with regard to his training. At one of our performance review meetings in July 2010, Mr. Hermange became very angry with me and lost his temper after I pointed out some errors in a report he had filed. He accused me of attempting to bully him, and he stood and began pounding the table, and insisting that I was out to get him. I felt very threatened and I disengaged almost immediately after asking him to calm down. I told him that I was going to get Vickie Gorley, the supervisor in charge of both of us. Ms. Gorley was not available, so I composed myself, went back in the room, and explained to him that I needed him to calm down. He was calm at that point, and I told him that if he felt he was being mistreated that he could file a complaint with human resources or the equal opportunity representative and I ended the meeting. I did not feel safe meeting with Mr. Hermange alone after that incident.

///

5

Declaration of Susana Alcantar in Support of Defendant's Motion for Summary Judgment, or in the Alternative, Summary Adjudication     16-CV-02847-BLF

14. My unit fell behind in accomplishing assigned tasks because Mr. Hermange was unable to complete his assignments. I had to focus on Mr. Hermange's training, and retraining, as well as his need for intensive supervision. I also often needed to complete his assigned tasks myself, or correct deficiencies in his work. I had very little time to complete my own duties. I reduced Mr. Hermange's assignments so that he could focus on just a few areas, but he was never able to handle all of the job assignments assigned to the Facilities Maintenance Representative on his own. My unit within the Probation Department fell so far behind, that we had to hire two "extra-help" temporary personnel to assist the unit. This was not something that was necessary in the past. The last three people that held Mr. Hermange's position did not need their workloads reduced and there was never a need to hire extra-help personnel to accomplish the unit's routine duties.

15. Mr. Hermange was routinely abrasive in his interactions with me since he started in May 2010, when I asked him to help move some boxes. He bent over and picked up a heavy box without using his legs and I said to him, "Mike, watch your back." I was trying to tell him to lift properly and avoid hurting himself. However, he immediately turned to me and said that I better watch saying things like that because people had gotten in trouble for saying such things. His tone was abrupt and abrasive, and I believe totally uncalled for given the circumstances. I was so taken aback by his response that I went to our Equal Employment Opportunity Division (EEOD) officer and asked her if what I said to him was inappropriate. The EEOD officer said it was not inappropriate, so I did not address the incident any further.

16. At no time did Mr. Hermange express to me that he felt I was discriminating against him based upon his race. In fact, my unit consisted of a very diverse group of staff that worked well with me. I did not discriminate against Mr. Hermange based upon his race or any other factors. I only ever dealt with Mr. Hermange's performance as it related to the requirements of his position. I believe that I was more than fair to Mr. Hermange and repeatedly went above the call of duty to train him and help him succeed. Ultimately, I believe that he was not willing to put in the effort to learn the job assignments required of a Facility Maintenance Representative for the Probation Department, and this led to repeated deficiencies in his performance.

///

6

Declaration of Susana Alcantar in Support of Defendant's Motion for                                    16-CV-02847-BLF
Summary Judgment, or in the Alternative, Summary Adjudication

17. While I recommended Mr. Hermange's release to Vickie Gorley and the management above her, I had no decision-making authority with regard to his release. I could merely make a recommendation, and I did so based upon his repeatedly unsatisfactory performance and his unwillingness to improve through retraining.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct and that this declaration was executed on November 27, 2018 at San José, California.

*/s/ Susana Alcantar*
SUSANA ALCANTAR

1891651

7

Declaration of Susana Alcantar in Support of Defendant's Motion for
Summary Judgment, or in the Alternative, Summary Adjudication

16-CV-02847-BLF