1  Michel Hermange
   3552 Clayton Road
2  San Jose, CA 95127
3  Tel: 408-533-2244
   Email: redchevyman@yahoo.com
4  Pro Se Plaintiff

FILED

JAN 02 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                  SAN JOSE DIVISION

| | |
|---|---|
| Michel Hermange | Case N. 5:16-CV-02847-BLF |
| Plaintiff(s), | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | Date: February 21, 2019 |
| County of Santa Clara | Time: 9:00 am |
| Defendant(s). | Courtroom: 3, 5th Floor |
| | Judge: Hon. Beth Labson Freeman |

21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

1

Plaintiff's Opposition to Defendant's Motion for Summary Judgment          Case No. 16-CV-02847 BLF

1

**<u>TABLE OF CONTENTS</u>**

2

3   I. INTRODUCTION ...................................................................................................... 3

4   II. STATEMENT OF FACTS ........................................................................................ 3

5   III. ARGUMENT ........................................................................................................... 8

6       A.  Plaintiff Belongs to a Protected Class ................................................................ 8

7       B.  Plaintiff Performed His Job Adequately .............................................................. 8

8           1. Mr. Hermange Was Doing a Good Job ......................................................... 8

9           2. Plaintiff's Note Taking .................................................................................. 9

10          3. Plaintiff Met Deadlines .................................................................................. 9

11          4. Discrimination .............................................................................................. 11

12          5. Disparate Treatment ..................................................................................... 12

13          6. County Supported and Covered Up Discrimination .................................... 13

14          7. Labor Relations Ignored Facts and Gave False Testimony at
              Personnel Board Hearing ............................................................................. 13

15

16          8.  Vicky Gorley Provides False Testimony In Release, Declaration and
               Personnel Board Hearing ............................................................................. 14

17

18          9. Susana Alcantar Provides False Testimony In Release, Declaration and
              Personnel Board Hearing ............................................................................. 15

19          10. The County Damages The Plaintiff's Career .............................................. 15

20

21          11. The County Refuses To Address Complaints And Continues To
              Burden The Plaintiff ..................................................................................... 16

22      C.  Plaintiff Suffered an Adverse Employment Action .......................................... 17

23

24      D.  Plaintiff Was Treated Less Favorably Than Similarly
            Situated Individuals Outside His Protected Class ............................................. 17

25

26      E.  Defendant's Stated Reasons For The Probational Release
            Are A Pretext For Discrimination ..................................................................... 18

27   IV. CONCLUSION ..................................................................................................... 18

28

## I.   INTRODUCTION

Plaintiff Michel Hermange has worked for the County of Santa Clara since 2006. He was released from the probationary position of Facilities Maintenance Representative (FMR), which was a promotion from his Maintenance Mechanic III position. Mr. Hermange was more than capable of performing the assigned tasks in a satisfactory manner, he was curious and wanted to learn more about his position and duties and therefore asked questions, not because he was resisting training or instruction but to gain a greater understanding so he could complete his tasks and deliver the desired results, and Mr. Hermange was pleasant and professional with all his coworkers.

Mr. Hermange's release was not due to poor work performance as claimed by the County, but rather due to racial discrimination by his manager, Susana Alcantar. Ms. Alcantar is Hispanic and Mr. Hermange is white.

Mr. Hermange can demonstrate through his meeting agendas, emails, notes, and other documents that he completed his assigned tasks as instructed. Mr. Hermange can show he received differential treatment at the hands of Ms. Alcantar and therefore the County is not entitled to summary judgment.

## II.   STATEMENT OF FACTS

Mr. Hermange applied for the promotional position of Facilities Maintenance Representative (FMR) at Adult Probation in 2010. He interviewed with Ms. Alcantar, who stated afterwards she would let Mr. Hermange know about a second interview once the other applicants had been interviewed. Mr. Hermange asked the number of other applicants and Ms. Alcantar replied she was not allowed to say. Mr. Hermange's second interview was with four managers from the Probation Department - Vickie Gorley, Susana Alcantar, Carolyn Joe, and Ted Bond.

Mr. Hermange was welcomed his first day by Vickie Gorley since Ms. Alcantar had taken a personal day and was not there. Mr. Hermange was later greeted by Ted Bond who expressed his concerned that Mr. Hermange would not be treated fairly since Ms. Alcantar had not wanted to hire him. Mr. Bond shared that Ms. Alcantar said she did not like Mr. Hermange and wanted to keep looking for another candidate. Ms. Alcantar had been told by Ms. Gorley that since Mr. Hermange

1  was fully qualified and the only applicant, she had to give him a chance or it would be discrimina-

2  tion. Ms. Alcantar replied "I can tell you right now he is not going to work out". Mr. Bond told Mr.

3  Hermange to be careful because Ms. Alcantar does not like white people and will  try to find an

4  excuse to get rid of him. *Ex. 200 (Deposition of Plaintiff Michel Hermange), 10:20-23.*

5         After Mr. Bond's visit, Carolyn Joe came to greet Mr. Hermange. Ms. Joe said to Mr. Her-

6  mange she needs to warn him that Ms. Alcantar is a racist and hates white people. Ms. Joe told him

7  to watch out since Ms. Alcantar did not want Mr. Hermange working for her and will most likely

8  try to get rid of him. Ms. Joe suggested he document all his work and keep detailed notes. Ms. Joe

9  informed Mr. Hermange that Ms. Alcantar got rid of Christine Leonard, the woman previously

10  doing his duties, who was also white. *Ex. 200, 106:9-23.*

11         During Mr. Hermange's first week, Ms. Alcantar asked him to move a lightweight box to

12  a storage closet. As he placed the box on the ground, Ms. Alcantar said "Hey Mike, watch your

13  back!".  Mr. Hermange politely replied "You need to be careful how you say that" and tried to tell

14  Ms. Alcantar about an incident that happened at Facilities and Fleet (FAF). Someone had written

15  "Watch your back" on a calendar, which lead to an investigation and Labor Relations releasing a

16  *memo stating "Watch your back" is considered a threat of physical violence and anyone who says*

17  that to a coworker will be subject to disciplinary action and possible termination. Ms. Alcantar

18  asked "Do you think I am threatening you". Mr. Hermange answered "No".  Ms. Alcantar abruptly

19  stalked off before Mr. Hermange could tell her about the FAF incident. Mr. Hermange didn't give

20  the exchange another thought. *Ex. 200, 79:23 - 83:6*

21         Mr. Hermange was fully capable of doing all his job duties and assignments as evidenced

22  by his bi-weekly reviews which showed no problems. The Bi-weekly reviews documented all the

23  training Mr. Hermange completed, areas for which he had not yet received training, and tasks he

24  was able to perform. It also documented that there were **no retrainings** during the probationary

25  period.

26         Mr. Hermange created Trend Reports which documented the extensive amount of work

27  that he was doing and that he was working at multiple facilities. Mr. Hermange created the Trend

28  Report from scratch in Excel, using a printed copy as a guide, therefore demonstrating he had

1  sufficient computer skills to do the job. These reports also show **Mr. Hermange was doing the**

2  **job of two people**, the FMR duties at Juvenile Probation Department (JPD) and Adult Probation

3  Department (APD). It is important to note that Mr. Hermange was fully doing both his job at APD

4  and that of Marilyn Rawlings at JPD because Ms. Rawlings had been gone since Mr. Hermange

5  started on May 17, 2010. *Ex. 200, 67:3-9.* It took three people to cover for Mr. Hermange when he

6  left. *Ex. 200, 108:8-14, 23-25; Ex. 200, 109:1-4.*

7      The FMR job was not difficult to learn as most tasks consisted of six sentence procedures

8  as outlined in the Fleet Training Manual. *Ex. 232 (Fleet Training Manual).* Mr. Hermange only

9  needed to be told once how to do any task and was then able to perform the task as instructed in

10  the future. Despite Ms. Alcantar's claims of extensive training, *Ex. 238, (Declaration of Susana*

11  *Alcantar ) ¶ 5* she provided limited training. She would tell Mr. Hermange she didn't have time to

12  train and he needs to figure stuff out on his own. *Ex. 200, 62:15-21.*

13      Mr. Hermange took **extensive notes and documented his daily activities**  The notes fill

14  nearly four notebooks and show the scope of Mr. Hermange's various responsibilities, volume of

15  work, documented when deadlines were met, and  highlight his commitment to doing a good job.

16  *Ex. 200, 29:22-24; 31:15-23.*

17      One of Mr. Hermange's duties was to order business cards for new employees, which is

18  done the first week of starting a new position. When Mr. Hermange was asked to order business

19  cards for Mike Clark, he asked Ms Alcantar if he should order cards for himself. She told him he

20  would not be getting cards until after his six month probationary period. This demonstrates differ-

21  ential treatment of Mr. Hermange by Ms. Alcantar since standard procedure was for new employ-

22  ees have them from the start. Ms. Alcantar also refused to order Mr. Hermange a work cell phone

23  until he completed his probationary period. A cell phone is an essential tool for a FMR working in

24  multiple facilities since they are often away from their desk and difficult to reach until they return.

25  This differential treatment indicates Ms. Alcantar had an agenda early on to get Mr. Hermange out

26  of her department.

27      Another example of differential treatment of Mr. Hermange by Ms. Alcantar was her

28  assigning him with sorting through all the trash, compost and recycle bins throughout Adult Proba-

5

1  tion. No other person before or after Mr. Hermange has been given this assignment. Ms. Alcantar

2  gave Mr. Hermange a box of blue nitrile gloves and said "Put these on so you don't get your hands

3  dirty". Ms. Alcantar instructed Mr. Hermange to sort through the trash twice a day and she would

4  check in with him to verify it had been done. *Ex. 200, 83:13 - 84:9*. This assignment was humili-

5  ating to Mr. Hermange. He endured coworkers pointing at him and laughing when they witnessed

6  him digging through the trash. In addition to being humiliating, it took time away from Mr. Her-

7  mange which he could have devoted to his regular duties. At one point, Rebecca Flores, an Equal

8  Opportunity Officer, pulled Mr. Hermange aside to express her concern about his mistreated by

9  Ms. Alcantar. Ms. Flores said sorting through trash was clearly not part of his job and he should

10 file a grievance.

11        The way in which Mr. Hermange's Probationary Release was handled was not standard

12 procedure. First, Sheila Mitchell, the Chief of Probation, came to Mr. Hermange's cube to in-

13 troduced herself and said she wanted to meet him in person before she approved the release that

14 Delores Nnam and Ms. Alcantar requested. *Ex. 200, 42:8 - 43:22*. Ms. Alcantar and Ms. Nnam

15 prepared the release in Vickie Gorley's, the white manager, name. Ms. Gorley had been on leave

16 *starting soon after Mr. Hermange met with her regarding his mistreatment and harassment by Ms*

17 Alcantar and did not return until after Mr. Hermange was served the release. Ms. Nnam had Ms.

18 Joe sign the release in Ms. Gorley's absence.

19        Next, On October 28, 2010, Ms. Alcantar served the Probationary Release on Mr. Her-

20 mange. Ms Alcantar had Mr. Hermange meet her in a secluded conference room inside the Internal

21 Affairs department, an area with limited access and no one else around. *Ex. 200, 72:1-21*. Ms. Al-

22 cantar chose a secluded location, with no one else around, to serve Mr. Hermange his release and

23 yet later testified at the Personnel Board hearing the real reason she was releasing Mr. Hermange

24 was because she feared for her life and was afraid to be near him.

25        Then, the original released served on Mr. Hermange omitted the information about his

26 right to an administrative review. *Ex. 235 (Emails Regarding Right To Administrative Review) &*

27 *Ex. 200, 26:1-10*. When Mr. Hermange pointed this out and demanded the review, the person who

28 requested his release (Delores Nnam) was the one to do the review. He protested stating it was a

6

conflict of interest but the County let Ms. Nnam perform the review, disregarding Mr. Hermange's rights to a unbiased review.  Mr. Hermange provided proof to Ms. Nnam that there was no legitimate cause for the release, *Ex. 200, 29:12 - 30:7.* but Ms Nnam upheld the release. Kimberly Gomez, from SEIU Local 521, investigated and came to the conclusion there was no evidence to support the release. *Ex. 200, 58:2-12.*

Mr. Hermange was the victim of unfair labor practices by Lisa Dumanowski, from Labor Relations. Ms. Dumanowski contacted Ms. Gomez and illegally tried to prevent her representing Mr. Hermange by claiming he had anger issues and Ms. Gomez should not represent him.

The Union represented Mr. Hermange at the Personnel Board hearing. Ms. Dumanowski opened with the false narrative Mr. Hermange was released for poor job performance which Ms. *Gorley* parroted. Ms. Alcantar continued the story but added "the real reason we had to get rid of him is that he has rage issues and I fear for my life when he is near me". Brian O'Neill, a member of the Personnel Board, asked if she was so afraid of Mr. Hermange why didn't Ms. Alcantar ask for help or ever write up Mr. Hermange for violent outbursts? The Personal Board voted 3-2 to uphold the release with the three county employees voting for and the two independent members voting against. *Ex. 240 (Finding of Facts), pg 3.*

After Mr. Hermange's release, he attended a retirement party for Mr. Bond at the James Ranch facility, where Mr. Bond stated to all present the only reason Mr. Hermange was no longer working at the Probation Department was because of his skin color.

Mr. Hermange made several attempts to avoid litigation. He contacted the Deputy County Exec. Luke Leung asking him to investigate Mr. Hermange's claim that the release was not due to work performance but was instead racially motivated. Mr. Leung met with Mr. Hermange for two hours and stated he would look into it, even though Mr. Leung later refused to take Mr. Hermange's calls or answer emails. Mr. Hermange notified County Exec. Jeff Smith and Mr. Lueng by email that he would file a complaint with EEOC if he did not hear from them within thirty days. After no response, Mr. Hermange filed but the EEOC did not investigated after five years *Ex. 200, 16:1-9 & 16-19* stating they were short staffed. Mr. Hermange received a right to sue letter in lieu of investigation. Mr. Hermange made another attempt to avoid litigation by contacting County

7

1  Deputy Exec. Sylvia Gallegos asking her investigate his claims of discrimination. She declined and

2  told Mr. Hermange to sue.

3  ### III.   ARGUMENT

4  **A.   Plaintiff Belongs to a Protected Class**

5  Mr. Hermange was released from his probationary position *Ex. 211 (Probationary Release)*,

6  due to his race, which is a protected class under Title VII. Mr. Hermange is white (Caucasian) and

7  Ms. Alcantar is Hispanic.

8  **B.   Plaintiff Performed His Job Adequately**

9  **1.   Mr. Hermange Was Doing a Good Job**

10  He was fully capable of doing all his job duties and assignments as evidenced by his

11  bi-weekly reviews which showed no problems. The Bi-weekly reviews documented all the training

12  that Mr. Hermange completed, areas for which he had not yet received training, and tasks he was

13  able to perform. It also documented that there were **no retrainings** during the probationary period.

14  *Ex. 222 (Review of Assignments)*

15  Mr. Hermange created Trend Reports *Ex. 231 (Trend Reports)* which documented the

16  *extensive amount of work that he was doing and that he was working at multiple facilities.* Mr.

17  Hermange created the Trend Report from scratch in Excel, using a printed copy as a guide,

18  therefore demonstrating he had sufficient computer skills to do the job.

19  The FMR job was not difficult to learn as most tasks consisted of six sentence procedures

20  as outlined in the Fleet Training Manual. *Ex. 232.* Mr. Hermange only needed to be told once how

21  to do any task and was then able to perform the task as instructed in the future. The County can not

22  show any task that Mr. Hermange needed to be told repeatedly how to do. The County does not

23  document even one task that the plaintiff can not do.

24  **No retraining occurred June 8, 2010 through July 14, 2010.** as claimed in Notice of

25  Probationary Release *Ex. 211, pg 5.* On July 15, 2010, Ms. Alcantar had Mr. Hermange meet her at

26  the RSU conference room for a retraining. She claimed she found 16 mistakes on Mr. Hermange's

27  fleet mileage entries. He retrieved his original log which he downloaded from the day he uploaded

28  the information. Mr. Hermange and Ms. Alcantar went over the information and discovered

1 | many of the vehicle miles had been changed after Mr. Hermange entered them. The miles on Mr.

2 | Hermange's master matched the miles on his fleet data entries, **so there were no mistakes made**

3 | **by him**. Ms. Alcantar called Bernice Smith at Fleet to asked if they had changed the mileage after

4 | Mr. Hermange entered it. Ms. Smith confirmed they do update the mileage based on data received

5 | from the fuel pumps and from vehicles going in for service. Once Ms. Alcantar hung up with

6 | Ms. Smith, her demeanor changed. She started talking to Mr. Hermange in an angry voice and

7 | telling him it is a privilege to work at the probation department. Ms. Alcantar started yelling at Mr.

8 | Hermange, not the other way around as claimed in the Probationary Release.  Mr. Hermange asked

9 | Ms. Alcantar put notes on his next Assignment Review on 7-23-10 stating that the retraining was

10 | not necessary. Mr. Hermange made no mistakes on the mileage. Ms. Smith from Fleet confirmed

11 | it. His master log matched his data print out. Ms. Alcantar put minimal notes on the back of the

12 | review stating "mileage no mistake". "Bernice". "checked his copy". "Bernice". *Ex. 200, 90:1 -*

13 | *93:23. Ex. 222, Pgs 7-8.*

14 | **2.      Plaintiff's Note Taking**

15 |       Mr. Hermange took **extensive notes and documented his daily activities** and

16 | *contrary to Ms. Alcantar's claims otherwise, he did not resist or refuse. Ex. 238, ¶7 ¶9.* Mr.

17 | Hermange asked question of Ms. Alcanter about what she wanted in the notes so he could

18 | provided her with the desired information. *Ex. 200, 66:14-25.* Mr. Hermange had four spiral-bound

19 | notebook full showing the scope of Mr. Hermange's various responsibilities, volume of work,

20 | documented when deadlines were met, and  highlight his commitment to doing a good job. *Ex.*

21 | *200, 29:22-24*

22 | **3.      Plaintiff Met Deadlines**

23 |       Mr. Hermange met all of his **assigned deadlines**, including the fleet mileage entries

24 | which were due at the beginning of each month. He also turned in his Trend Reports on the day

25 | they were due every month.

26 |       Ms. Alcantar repeatedly claims Mr. Hermange missed deadlines. *Ex. 238, ¶ ¶ 11-12*

27 | She claims that on August 20, 2010 she assigned a Vehicle User Report. **This was only a "heads-**

28 | **up" and no due dates were given**. Ms. Alcanter never said she wanted by Sept. 13, 2010 or Sept.

20, 2010 so no deadlines were missed. In the Review of Assignment 8-20-10 (mistakenly dated 7-20-18), Ms. Alcantar has "Preparation for Vehicle rotation will start on the week of September 13th - the 17th". *Ex. 222, pg 10*. Mr. Alcantar was very clear in the Review of Assignments - September 13, 2010 that Mr. Hermange was to **only interview the Supervising Probation Officers (SPO)**. *Ex. 222, pg 12*. Instructions were to interview the SPO's only because they are the only ones who may have special vehicle needs - cage, tinted windows, four-wheel drive, etc. **There were 23 SPOs** and 26 other vehicle users for a total of 49 people. The term "SPO" and "vehicle user" are used interchangeably in the Probationary Release and Ms. Alcantar's Declaration **but they are not the same**. When Ms. Alcantar emailed Mr. Hermange her request to have the report done by 10-1-10, he was already nearly done with the interviews.

Ms. Alcantar claimed she gave this assignment in July in her email *10-29-10* and in the release. On August 20, 2010, Ms. Alcantar asked Mr. Hermange to familiarize himself with the needs of the unit. She instructed him to ask the SPOs what type of work they do to understand the type of vehicle to give them. Mr. Hermange asked Ms. Alcantar if she could take him on the first couple of interviews so he could get an idea of the kind of questions to ask. She said "Yes, I will take you *on a couple to get you started when I get time." In Mr. Hermange's next Review of Assignments* - September 13, 2010, Ms. Alcantar states "You have been asked to talk to SPOs regarding their needs for vehicles in their units. You asked me to take you first and show you how. This should be something that you can handle on your own. Assertiveness is needed." *Ex. 222, pg 12*.

Mr. Hermange started the interviews September 23, 2010 and his last interview was September 30, 2010. He completed and printed the report October 1, 2010. On October 1, 2010 there was Facilities meeting with Ms. Alcantar, John Tran, Deborah Gomez, and Mr. Hermange during which Ms. Alcantar asked Mr. Hermange to turn in the SPO Notes Report on Monday, October 4, 2010, along with a mileage report. *Ex. 223 (SPO Notes and Report)*. Mr. Hermange was able to get his SPO interviews completed before they were due, even though Ms. Alcantar refused to tell him what information she expected. He formatted and completed the report of the SPO vehicle needs

Mr. Hermange sent all of the emails requesting mileage out on time every month. He was able to verify all the email Safety Equipment Check Sheets where completed and replaced missing

10

safety equipment immediately. All deadlines were given in Review of Assignments.

**4.    Discrimination**

Ms. Alcantar exposed she had a discriminatory agenda towards Mr. Hermange starting with his first interview. She stated she would let Mr. Hermange know if he would be getting a second interview once she was done interviewing all the other applicants. Mr. Hermange was the only applicant *Ex. 200, 115:18 - 116:25*. This shows Ms. Alcantar had already decided she did not want him working there and was not planning on calling him back for a second interview.

Ms. Gorley made arrangements for a second interview with Mr. Hermange. The four-person interview panel consisted of Vickie Gorley, Susana Alcantar, Ted Bond and Carolyn Joe. On May 17, 2010, Ted Bond and Carolyn Joe both warned Mr. Hermange that Ms. Alcantar did not want to hire him. They both said Ms. Gorley forced Ms. Alcantar to hire Mr. Hermange and that Ms. Alcantar said "he would not be working out". *Ex. 200, 102:11-16 & 103:7-23*

Ms. Alcantar's actions show a pretext for discrimination. *Ex. 200, 11:6-11 & 17-18*. Ms. Alcantar went to extremes to find fault in every interaction with Mr. Hermange, documenting the most basic statements as somehow being cause for release.  Ms. Alcantar claimed that *Mr. Hermange saying "I will see tomorrow" was unprofessional or asking about the type of* information he should include in his note is being defiant. Ms. Alcantar said Mr. Hermange was unprofessional when he suggested telling someone to "watch your back" could be misconstrued as a threat and she alleged Mr. Hermange "went off on her" during that conversation. Ms. Alcantar claims Mr. Hermange asked "Why" when she asked him to take notes for an upcoming Health Inspection when he actually asked her "what kind of information do you want in the notes".

Ms. Alcantar created the FMR position as a promotional opportunity for her non-sworn office staff at Probation. She was responsible for the hiring of most the secretarial staff **which were almost exclusively female Hispanics**. Ms. Alcantar wanted one of her Hispanic employees to get the promotion but none of them met the minimum qualifications to have their applications accepted. She wanted Mr. Hermange out of the FMR position to give one of her staff another chance to apply for the job when it reopened.  After Mr. Hermange was released, the position was given to Ms. Frances Francis, a female Hispanic CalWorks participant, as extra help.

11

The FMR position was eventually filled permanently by Tito Rodriguez, a Hispanic male. Mr. Tito Rodriguez required help so Michael Rodriguez, a Hispanic male, was hired to take over some of Mr. Tito Rodriguez's duties. Clearly Hispanics are favored in the hiring practices at the Probation department. *Ex. 200, 47:14-22.* The three white employees, Christine Leonard, Marilyn Rawlings, and Mike Hermange, were all forced out within twelve months.

## 5.   **Disparate Treatment**

Mr. Hermange was treated differently than the non-white workers and was subjected to daily harassment and humiliation. *Ex. 200, 11:24 - 12:5.* Ms. Alcantar would go to Mr. Hermange's cubicle and speak to him in a rude, aggressive manner. The constant berating was so overly dramatic and exaggerated that Mr. Hermange thought is was part of a hazing ritual for new employees. If Mr. Hermange asked Ms. Alcantar a question, she would angrily scold him for not using his resources which included other employees or training manuals. If he used his resources, she would scold him and say he should have gone to her.

Ms. Alcantar scrutinized everything Mr. Hermange did and would make absurd claims, such as forwarding a vehicle user's list of mechanical issues directly to Fleet was somehow a violation of email etiquette. *Ex. 211, Pg 7, ¶ 4 "On August 23, 2010...  Normal protocol is for the* vehicle user to bring their car in for service and complete a repair order detailing any issues. If the vehicle user then requests the vehicle be returned for service just days after being serviced, there must be a good reason so forwarding the user's concern directly would be appropriate.

Ms. Alcantar subjected Mr. Hermange to humiliating and disparate treatment by insisting he sort through 36 trash, recycle and compost bins twice a day. Ms. Alcantar would call Mr. Hermange daily to make sure he was doing it. Ms. Alcantar would refer to this task in the Review of Assignments as "checking the recycle program". This humiliating task was never required of anyone before Mr. Hermange and no one has done it after him. It was potentially dangerous due to risk of needle sticks. Equal Opportunity officer Rebecca Flores asked Mr. Hermange to speak to her in her office. She asked why Mr. Hermange would allow himself to be subjected to such humiliating and potentially dangerous tasks. She said not even janitors would be asked to sort through trash and compost. She advised Mr. Hermange to file a grievance to end the humiliation. *Ex. 200, 99:25 - 100:25*

12

1  Ms. Alcantar told Mr. Hermange he would not be receiving business cards or a work phone

2  until he passed his six month probationary period. Yet, Mr. Hermange was routinely directed to

3  order business cards for other new hires who had not completed their probationary periods.

4  Ms. Alcantar would exclude Mr. Hermange from office luncheons when the entire

5  Administrative Resource Unit (ARU) staff would go out to celebrate a worker's last day.

6  **6.    County Supported and Covered Up Discrimination.**

7  In an effort to cover up obvious discrimination, Lisa Dumanowski had management

8  at Adult Probation put the release in Vickie Gorley's - a white manager - name. Ms. Gorley was

9  on leave the entire time the release was being created by Labor Relations and Ms. Alcantar. Ms.

10  Dumanowski omitted the right to Administrative Review in release to deprive Mr. Hermange

11  of his administrative remedy to get the unwarranted demotion overturned. When Mr. Hermange

12  requested the release be reviewed, Ms. Dumanowski had Delores Nnam do the review. *Ex. 235,*

13  *3rd pg.* This was a clear conflict of interest since Sheila Mitchell, the Chief Probation Officer,

14  had told Mr. Hermange that Delores Nnam and Susana Alcantar were the only two people who

15  requesting his release. *Ex. 200, 42:16-18*

16  Furthermore, Ms. Dumanowski engaged in an unfair labor practice by trying to convince

17  Mr. Hermange's union representative to not represent him at the Personnel Board Hearing, thus

18  damaging Mr. Hermange's chance of a fair outcome at the hearing. Ms. Dumanowski called

19  Kimberly Gomez, Mr. Hermange's union representative, and told her not to represent Mr.

20  Hermange because he is a bad person with rage issues. Ms. Dumanowski alleged he harassed a

21  manager at home. She further alleged he visited her office, screamed at her, and she almost had

22  to discipline him. Ms. Dumanowski purports there is an incident report at Adult Probation of Mr.

23  Hermange engaging in menacing behavior.

24  **7.    Labor Relations Ignored Facts and Gave False Testimony at**
**      Personnel Board Hearing.**

25

26  In another attempt to conceal the discriminatory nature of the release, Labor

27  Relations made dozens of false and libelous statements at the Personnel Board hearing. *Ex. 250,*

28  *(Excerpts from Mike Hermange Personnel Board Hearing Transcript), 6:8-12 & 8:4 - 11:21.*

13

After cataloging all of the 300+ pages of documents in support of the County's Release of Mr. Hermange, it's implausible Ms. Dumanowski could not have known there was not even one task Mr. Hermange could not do. Mr. Hermange had submitted an answer to the release with **documented proof the various claims were false** including claims of mistakes on mileage entered to fleet, missed deadline on SPO report, procedure for credit cards not followed, and procedure for reserving loaner car not followed. Ms. Dumanowski did her best to hide the fact that **Mr. Hermange was doing the job of two people**, the FMR duties at Juvenile Probation Department (JPD) and Adult Probation Department (APD). She side-stepped the questions when the Personnel Board asked if there were two FMR's working when Mr. Hermange was at Probation. *Ex. 250, 234:21 -235:21* It is important to note that Mr. Hermange was fully doing both his job at APD and that of Marilyn Rawlings' at JPD because Ms. Rawlings had been gone since Mr. Hermange started on May 17, 2010. It took three people to cover for Mr. Hermange when he left.

    Ms. Dumanowski also failed to walk the Personnel Board through the documentation as she told the board she would. *Ex. 250, 26:3-8*

    **8.**    **Vickie Gorley Provides False Testimony In Release, Declaration, And Personnel Board Hearing**

    Ms. Gorley alleged Mr. Hermange failed to follow procedure for ordering gas cards. *Ex. 211, Pg 7, last* ¶ and that Mr. Hermange was only responsible for APD. *Ex. 250, 32:16-22*

    Ms. Gorley contends the plaintiff cost the department unnecessary expenses by not following departmental procedure. *Ex. 250, 39:15 - 40:7* **No cost was ever incurred since the car reservation was canceled the same day it was made.** Mr. Hermange did follow the procedures by checking if ARU vehicle was available. He did let Ms. Alcantar know he checked the ARU units vehicle availability and he told Ms. Alcantar it was reserved by Kevin Cooper for the whole week. Ms. Alcantar then sent an email to Mr. Hermange asking him "Did you call and speak to Kevin Cooper?" *Ex. 236, (Email 9/29/10; Re: Fw Vehicle Reservation)* Mr. Hermange then called Kevin Cooper and Mr. Cooper said we could use the vehicle for the out of town trip. Mr. Hermange then canceled the car reservation.

**The gas card did not incur a cost to the department since the request was never**

14

1  **submitted.** Ms. Alcantar asked Mr. Hermange to check inventory before ordering the card. Mr.

2  Hermange had never been trained on gas cards or told there were some in inventory. *Ex. 237,*

3  *(County of Santa Clara, Memorandum) 2nd page, last lines.*

4         **9.**     **Susana Alcantar Provides False Testimony In Release, Declaration And**

5                **Personnel Board Hearing**

6            The Probationary Release contained hundreds of pages of documents which were

7  supposed to show Mr. Hermange's inability to do the job. The reason for so many pages was

8  to make sure nobody would read it. The assumption would be that there must be something in

9  there that shows good cause for releasing Mr. Hermange. Ms. Gomez, the contracts enforcement

10  officer for SEIU 521, took the time to read the entire 300+ pages and concluded that there was

11  not anything in the packet that substantiated Ms. Alcantar's claim of poor work performance. The

12  packet shows Mr. Hermange created hundreds of pages of reports and did thousands of individual

13  data entries.

14      Ms. Alcantar made dozens allegations in her declarations. She stated at least five times she

15  needed to repeatedly retrain Mr. Hermange. **Mr. Hermange was never retrained in any of his**

16  ***duties because he was doing them all correctly from the first and only trainings he received.***

17  Ms. Alcantar contends Mr. Hermange was never able to handle all of his job assignments, missed

18  deadlines, failed to accurately record mileage, failed to file timely reports, failed to follow

19  instruction and protocol. *Ex. 238, ¶¶ 8-11.* None of those statements were true.

20         **10.**    **The County Damages The Plaintiff's Career**

21           The County's support of the discrimination and subsequent cover up have damaged

22  Mr. Hermange's ability to be promoted or find outside employment.  Mr. Hermange was working

23  on a career plan at the County. He started in August 2006 by getting an entry level job into the

24  County as a Maintenance Mechanic II. He is a very fast learner was promoted to Maintenance

25  Mechanic III two years later, beating out candidates with 20+ years experience in the department.

26  Two years after that, he was promoted to FMR at Adult Probation. His plan was to learn Ms.

27  Alcantar's job of Program Manager so he could take her place when she retired in two years.

28       Instead, Mr. Hermange has been blacklisted at the County. Mr. Hermange has applied for

several promotions *Ex. 239, (Application Submission History for Mr. Hermange)* and has had his applications rejected. Mr. Hermange would have been at a disadvantage if he applied at a job outside of the County due to Ms. Dumanowski posting an inaccurate "Finding of Facts" online describing Mr. Hermange as incompetent and inefficient. This document was the first thing to came up in an online search for "Mike Hermange". *Ex. 240* and would have been visible to a potential employer. Mr. Hermange is making at least $55,000 less per year *Ex. 241, (Work Center Manager & General Maintenance Mechanic III  Job Descriptions)* because of the County's actions. The "Finding of Fact" was inaccurate and is a confidential employee discipline matter. The County violated it's own privacy policies posting this. Mr. Hermange believes the public posting of this document was retaliatory in nature. He complained to the County years ago to requested it be removed it but they did not remove it until December 13, 2018.

   If Mr. Hermange had been able to stay at Adult Probation, he would have been the most qualified person to take over for Ms. Alcantar and he would have been able to promote up from there. Mr. Hermange would be able to retire today with a much greater retirement benefit. This action caused lifetime damages of potential retirement income.

### 11.   The County Refuses To Address Complaints And Continues To Burden The Plaintiff

   Mr. Hermange has given the County many opportunities to correct the illegal activity it has engaged in. Every time he brings it to another official's attention, the County refuses to respond or take action to remedy the complaint. Mr. Hermange has complained about being discriminated against to numerous County officials including Carl Coates *Ex. 242, (Carl Coates' Business Card)* with the County Equal Opportunity Department, Deputy County Executive Luke Lueng *Ex. 243, (Emails to Luke Lueng cc: Jeff Smith)*, County Executive Jeff Smith, Deputy County Executive Sylvia Gallegos *Ex.200, 16:25 - 17:12*, Dave Cortese of the Board of Supervisors and Cindy Chavez of the Board of Supervisors.

   Mr. Hermange filed a complaint with the Federal EEOC *Ex. 227, (EEOC Form - Charges of Discrimination)* which the County responded to vigorously defending the County's position without ever speaking to Mr. Hermange to see if his complaints had merit. *Ex. 226, (County*

Plaintiff's Opposition to Defendant's Motion for Summary Judgment          Case No. 16-CV-02847 BLF

1 *response to EEOC)* To this day the County Equal Opportunity has not contacted Mr. Hermange
2 for his side of the story even though the County's official position is to investigate all claims of
3 discrimination. *Ex. 244, (County Policy on Discrimination)*

4     The County won't stipulate to any facts or discuss in any official capacity with Mr.
5 Hermange about the validity of his claims. The County continues to act in bad faith and resorting
6 to legal trickery by submitting the Motion for Summary Judgment hoping Mr. Hermange will
7 misstep so the case is dismissed without ever having to answer for or be held accountable for their
8 highly documented illegal activity.

9     The County Board of Supervisors did an internal investigation of the relationship between
10 Labor Relations and Management. They found Labor Relations supported Management's harassment,
11 retaliation, and other labor related violations. The report was given to Jeff Smith and any remedy was
12 left to his discretion. *Ex. 229, (Letter From County Counsel - Re: Public Records Request)*

13 **C.    Plaintiff Suffered an Adverse Employment Action**

14     Mr. Hermange was released from his FMR position, which was a promotion, and returned
15 to his Maintenance Mechanic III position. Mr. Hermange is making at least $55,000 per year
16 *less because of the County's actions. Mr. Hermange has been blacklisted at the County. He has*
17 applied for seven promotions and has had his applications rejected. Mr. Hermange was also at
18 a disadvantage if he applied for a job outside of the County due to Ms. Dumanowski posting an
19 inaccurate "Finding of Facts" online describing Mr. Hermange as incompetent and inefficient. This
20 document was the first thing to came up in an online search for "Mike Hermange" and visible to a
21 potential employer.

22     If Mr. Hermange had been able to stay at Adult Probation, he would have been the most
23 qualified person to replace Ms. Alcantar when she retired. He would not have had the stain
24 of "incompetent and inefficient" on his record and could have pursued career advancement
25 opportunities. Mr. Hermange would be able to retire today with a much greater retirement benefit.
26 This action caused lifetime damages of potential retirement income.

27 **D.    Plaintiff Was Treated Less Favorably Than Similarly Situated Individuals Outside His Protected Class**
28

17

Ms. Alcantar would routinely speak to Mr. Hermange in a rude, aggressive, and unprofessional manner. The constant berating was so overly dramatic and exaggerated that Mr. Hermange thought is was part of a hazing ritual for new employees. If Mr. Hermange asked Ms. Alcantar a question, she would angrily scold him for not using his resources which included other employees or training manuals. If he used his resources, she would scold him and say he should have gone to her.

Ms. Alcantar subjected Mr. Hermange to humiliating and disparate treatment by insisting he sort through trash, recycle and compost bins twice daily and she would call Mr. Hermange to verify it was done. This humiliating task was never required of anyone prior to Mr. Hermange nor has it been since his departure.

Ms. Alcantar told Mr. Hermange he would not be receiving business cards or a work phone until he passed his six month probationary period. Yet, Mr. Hermange was routinely directed to order business cards for other new hires who had not completed their probationary periods.

Ms. Alcantar was hypercritical of Mr. Hermange's job performance. Minor items which would have been seen as part of the learning curve for most new employees, were exaggerated, *documented, and submitted as evidence against Mr. Hermange, even when Mr. Hermange* presented Ms. Alcantar with documentation to show he had performed as directed.

**E.    Defendant's Stated Reasons For The Probationary Release Are A Pretext
For Discrimination**

Mr. Hermange has established that the County's stated reasons for his probationary release are a pretext for discrimination. Mr. Hermange has provided evidence he was more than competent when performing his job duties, took extensive notes, possessed the necessary computer skills, met his assigned deadlines, was able to follow minimal direction, did not require retraining, and was professional in his attitude. Mr. Hermange has met his burden with the provided evidence and therefore, the County is not entitled to summary judgment is this case.

## IV.    CONCLUSION

Mr. Hermange has established a *prima facie* case because he has shown he was performing adequately and that he was treated less favorably than similarly-situated individuals outside his

18

1  protected class. The County has not presented evidence - other than self-serving testimony -  that

2  Mr. Hermange's performance was inadequate and can not demonstrate legitimate, nondiscriminatory

3  reasons for his release from the FMR position. Mr. Hermange has presented evidence that the

4  County's stated reasons for his probationary release are a pretext for discrimination. Mr. Hermange

5  respectfully requests that the Court deny the motion for summary judgment.

6

7  Dated: January 2, 2019                    Respectfully submitted,

8

9                                   By:   _____

10                                        MICHEL HERMANGE
11                                        *Pro Se Plaintiff*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff's Opposition to Defendant's Motion for Summary Judgment          Case No. 16-CV-02847 BLF