Michel Hermange
3552 Clayton Road
San Jose, CA 95127
Tel: 408-533-2244
Email: redchevyman@yahoo.com
Pro Se Plaintiff

FILED
JAN 02 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

Michel Hermange

Plaintiff(s),

v.

County of Santa Clara

Defendant(s).

Case N. 5:16-CV-02847-BLF

**DECLARATION OF MICHEL HERMANGE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Date: February 21, 2019

Time: 9:00 am

Courtroom: 3, 5th Floor

Judge: Hon. Beth Labson Freeman

I, MICHEL HERMANGE, declare:

1. I have personal knowledge of the following facts described herin except those I state on information and belief, which I believe to be true. If called to testify, I could and would testify competently thereto.

2. I applied for the promotional position of Facilities Maintenance Representative (FMR) at Adult Probation Department (ADP) in 2010. I interviewed with Ms. Alcantar, who stated afterwards she would let me know about a second interview once the other applicants had been interviewed. I asked the number of other applicants and Ms. Alcantar replied she was not allowed

1

Declaration of Michel Hermange in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment Case No. 16-CV-02847 BLF

to say. My second interview was with four managers from the Probation Department - Vickie Gorley, Susana Alcantar, Carolyn Joe, and Ted Bond.

3. I was welcomed my first day by Vickie Gorley since Ms. Alcantar had taken a personal day and was not there. I was later greeted by Ted Bond who expressed his concerned that I would not be treated fairly since Ms. Alcantar had not wanted to hire me. Mr. Bond shared that Ms. Alcantar said she did not like me and wanted to keep looking for another candidate. Ms. Alcantar had been told by Ms. Gorley that since I was fully qualified and the only applicant, she had to give me a chance or it would be discrimination. Ms. Alcantar replied "I can tell you right now he is not going to work out". Mr. Bond told me to be careful because Ms. Alcantar does not like white people and will try to find an excuse to get rid of me.

4. After Mr. Bond's visit, Carolyn Joe came to greet me. Ms. Joe said to me she needs to warn me that Ms. Alcantar is a racist and hates white people. Ms. Joe told me to watch out since Ms. Alcantar did not want me working for her and will most likely try to get rid of me. Ms. Joe suggested I document all my work and keep detailed notes. Ms. Joe informed me that Ms. Alcantar got rid of Christine Leonard, the woman previously doing my duties, who was also white.

5. *Within my first few days on the job, I was shown piles of vehicle logs that were* needing to be filed going back approximately 6 months since Christine Leonard left. None of the Inventory Checklist had been completed either. I was told I would need to do all of the Fleet Service scheduling and found the Vehicle Due for Service Report in my cubicle. It showed 146 vehicles overdue for service by an average of 120 days. By the time I left in November, I had the vehicles down to only six due for service on November 10th. There was also a backlog of work that needed to be done for Juvenile Probation Department (JPD). The FMR, Marilyn Rawlings, in charge of that area had gone out for knee surgery before I started. I had to cover for her as well as learn my job. None of the work was difficult, just a lot of it but I was able to keep up. I learned the Fleet in a couple of days. I would check the Vehicle Due for Service Report from the Fleet Garage, pick out the most overdue vehicles, call the vehicle user, and see what date was good for them. Then call the Fleet Garage and make a reservation for service. Then ask them to how many more loaners they had available. I would make the appointments for as many as the Fleet Garage

can take. An average of 27 cars a month came due for service so it was challenging to get them all serviced with the limited availability of the loaners.

6. During my first week, Ms. Alcantar asked me to move a lightweight box to a storage closet. Francis Francis, one of the two extra help people hired in Adult Probation, was also helping with the boxes. As I placed the box on the ground, Ms. Alcantar said "Hey Mike, watch your back!". I politely replied "You need to be careful how you say that" and tried to tell Ms. Alcantar about an incident that happened at Facilities and Fleet (FAF). Someone had written "Watch your back" on a calendar, which lead to an investigation and Labor Relations releasing a memo stating "Watch your back" is considered a threat of physical violence and anyone who says that to a coworker will be subject to disciplinary action and possible termination. Ms. Alcantar asked "Do you think I am threatening you". I answered "No". Ms. Alcantar abruptly stalked off before I could tell her about the FAF incident. I didn't give the exchange another thought.

7. I was fully capable of doing all my job duties and assignments as evidenced by the bi-weekly reviews which indicated no problems. The reviews documented the training I completed, areas for which I had not yet received training, and tasks I was able to perform. It *also documented that there were no retrainings during the probationary period. Ms. Alcantar had* me splitting time between JPD in the Civic Center campus on Guadalupe Parkway and APD in North San Jose. I often would report to JPD at 8 a.m. and stay until 10 a.m., then drive to APD and arrive about 10:15 am. using my personal vehicle to travel between locations. I would check Ms. Rawlings' voice mail and address any concerns. I meet with Matt from Western Pest Control twice a month at Juvenile Hall and JPD. I had many meetings with FAF at Juvenile Hall and JPD due to many projects in those aging buildings. JPD and Juvenile Hall are a full-time job for one person but I was doing that job on top of the Fleet Scheduling and Facilities at APD that I had been hired for. I did the job of two people for the majority of the six months I work for probation. I received praise from many of the staff at both JPD Juvenile Hall and APD for the taking care of issues quickly and for my knowledge of the Building Systems.

8. I created Trend Reports which documented the extensive amount of work I was doing and showed I was working at multiple facilities. I created the reports from scratch in Excel,

using a printed copy as a guide, therefore demonstrating my sufficient computer skills to do the job. These reports also show I was doing the job of two people because I was covering the FMR duties for the Juvenile Probation Department (JPD) and the Adult Probation Department (APD). I was performing the duties of Marilyn Rawlings at JPD because Ms. Rawlings had been gone since I started on May 17, 2010. It took three people to cover for me when I left.

9. The FMR job was not difficult to learn as most tasks consisted of six sentence procedures as outlined in the Fleet Training Manual. I only needed to be told once how to do any task and was then able to perform the task as instructed in the future.

10. I took extensive notes and documented my daily activities My notes fill nearly four notebooks and show the scope of my various responsibilities, volume of work, documented when deadlines were met, and highlight my commitment to doing a good job.

11. Working for Ms. Alcantar was a challenge since she would often talk to me in a rude and aggressive tone. I was told by Ms. Alcantar that she did not have time to train me so I better take notes since she would not be repeating herself. I took extensive notes and filled four Steno pads with notes during my tenure at Probation. I also put notes on my desktop calendar *and dozens of sticky notes for items that I did not want to keep. I sent emails to myself as well.* Mr. Alcantar did not ever ask to review my notes. My release said that I failed to take notes even though Ms. Alcantar and Ms. Gorley watched me take notes daily.

12. One of my duties was to order business cards for any new employees, which is done the first week of starting a new position. When I asked Ms Alcantar if I should order business cards for myself, she told me I would not be getting cards until after my six month probationary period. This demonstrates differential treatment of me by Ms. Alcantar since standard procedure was for new employees have cards from the start. Ms. Alcantar also refused to order me a work cell phone until I completed his probationary period. A cell phone is an essential tool for me as an FMR working in multiple facilities since I was often away from my desk and difficult to reach until I returned. This differential treatment indicates Ms. Alcantar had an agenda early on to get me out of her department.

13. Another example of differential treatment of me by Ms. Alcantar was her assigning

4

Declaration of Michel Hermange in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment Case No. 16-CV-02847 BLF

me with sorting through all the trash, compost and recycle bins throughout Adult Probation. No other person before or after me has been given this assignment. Ms. Alcantar gave me a box of blue nitrile gloves and said "Put these on so you don't get your hands dirty". Ms. Alcantar instructed me to sort through the trash twice a day and she would check in with me to verify it had been done. This assignment was humiliating to me. I endured coworkers pointing at me and laughing when they witnessed me digging through the trash. In addition to being humiliating, it took time away from me which I could have devoted to me regular duties. At one point, Rebecca Flores, an Equal Opportunity Officer, pulled me aside to express her concern about my mistreated by Ms. Alcantar. Ms. Flores said sorting through trash was clearly not part of my job and I should file a grievance.

14. The way in which my Probationary Release was handled was not standard procedure. First, Sheila Mitchell, the Chief of Probation, came to my cube to introduced herself and said she wanted to meet me in person before she approved the release that Delores Nnam and Ms. Alcantar requested. Ms. Alcantar and Ms. Nnam prepared the release in Vickie Gorley's, the white manager, name. Ms. Gorley had been on leave starting soon after I met with her regarding *my mistreatment and harassment by Ms Alcantar and did not return until after I was served the* release. Ms. Nnam had Ms. Joe sign the release in Ms. Gorley's absence.

15. Next, On October 28, 2010, Ms. Alcantar served the Probationary Release on me. Ms Alcantar had me meet her in a secluded conference room inside the Internal Affairs department, an area with limited access and no one else around. Ms. Alcantar chose a secluded location, with no one else around, to serve me my release and yet later testified at the Personnel Board hearing the real reason she was releasing me was because she feared for her life and was afraid to be near me.

16. Then, the original released served on me omitted the information about my right to an administrative review. When I pointed this out and demanded the review, the person who requested my release (Delores Nnam) was the one to do the review. I protested stating it was a conflict of interest but the County let Ms. Nnam perform the review anyway, disregarding my rights to an unbiased review. I provided proof to Ms. Nnam that there was no legitimate cause for the release, but Ms. Nnam ignored it and upheld the release. Kimberly Gomez, from SEIU Local

521, investigated and came to the conclusion there was no evidence to support the release.

17. I was the victim of unfair labor practices by Lisa Dumanowski, from Labor Relations. Ms. Dumanowski contacted Ms. Gomez and illegally tried to prevent her from representing me by claiming I had anger issues and Ms. Gomez should not represent me.

18. The Union represented me at the Personnel Board hearing. Ms. Dumanowski opened with the false narrative I was released for poor job performance which Ms. Gorley parroted. Ms. Alcantar continued the story but added "the real reason we had to get rid of him is that he has rage issues and I fear for my life when he is near me". Brian O'Neill, a member of the Personnel Board, asked if she was so afraid of me why didn't Ms. Alcantar ask for help or ever write me up for violent outbursts? Despite the lack of evidence on the County's part, the Personnel Board voted 3-2 to uphold the release with the three county employees voting for, in my opinion based solely on Mr. Alcantar's false claims of rage, and the two independent members voting against. The independent members later told me the release was without merit and it was obvious there was some other reason I was released.

19. Several months later, I attended a retirement party for Mr. Bond at the James Ranch facility, where Mr. Bond stated to all present the only reason I was no longer working at the Probation Department was because of my skin color.

20. I made several attempts to avoid litigation. I contacted the Deputy County Exec. Luke Leung asking him to investigate my claim that the release was not due to work performance but was instead racially motivated. Mr. Leung met with me for two hours and stated he would look into it, even though Mr. Leung later refused to take my calls or answer emails. I notified County Exec. Jeff Smith and Mr. Lueng by email that I would file a complaint with EEOC if I did not hear from them within thirty days. After no response, I filed but the EEOC did not investigated after five years stating they were short staffed. I received a right to sue letter in lieu of investigation. I made another attempt to avoid litigation by contacting County Deputy Exec. Sylvia Gallegos asking her investigate my claims of discrimination. She declined and told me to sue.

21. I went to the first Court date in the Federal Court and County Council sent a representative in lieu of Stephen Schmid, who is assigned to this case, to hear the Court's

6

Declaration of Michel Hermange in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment Case No. 16-CV-02847 BLF

deadlines. The Court ordered the two sides meet and confer to see what we can both agree on. I contacted Mr. Schmid and we agreed the following week would be a good time to meet. I asked him to have someone from the County Exec. at our meeting and to bring the transcripts from the Personnel Board hearing and their response to the EEOC. Mr. Schmid replied back the County Exec will not send a representative and the County Exec. stands behind the Personnel Boards decision. I called Mr. Schmid so we could arrange to meet and confer as required. Mr. Schmid refused stating it would be a waste of time since my claims of false release are irrelevant to my claim of discrimination. County Council then sent a letter to the Court falsely claiming that I refused to meet and confer.

22. I am not contesting the Personnel Boards decision. If I wanted to do that I would have filed for a judicial review of the Personnel Boards decision. I am not asking for the FMR position back. I am suing the County because they knowingly supported blatant discrimination by a manager with a long history of prejudice and bias against white employees. Labor Relations used illegal labor practices and ignored all evidence proving the release was false. There is no oversight for Labor Relations. Even after the Board of Supervisors reviewed complaints of harassment, *retaliation, and discrimination by management, which Labor Relations supported, nothing has been* done to stop it.

23. Attached as Exhibit 200 is a true and correct copy of excerpts of the deposition of Michel Hermange, taken on June 12, 2018. Attached as Exhibit 211 is a true and correct copy of Notice of Probationary Release effective November 12, 2010. Attached as Exhibit 222 is a true and correct copy of Review of Assignments. Attached as Exhibit 223 is a true and correct copy of excerpts of the notes taken from SPO Interviews and the Completed Report. Attached as Exhibit 226 is a true and correct copy of County of Santa Clara Response to Michel Hermange v County of Santa Clara. Attached as Exhibit 227 is a true and correct copy of EEOC form Charges of Discrimination. Attached as Exhibit 229 is a true and correct copy of the County letter in response to Mr. Hermange's Public Records Request. Attached as Exhibit 231 is a true and correct copy of Mr. Hermange's Trend Reports. Attached as Exhibit 232 is a true and correct copy of the Fleet Procedure Manual. Attached as Exhibit 235 is a true and correct copy of email concerning Mr.

7

Declaration of Michel Hermange in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment — Case No. 16-CV-02847 BLF

Hermange's right to Administrative Review. Attached as Exhibit 236 is a true and correct copy of Vehicle Reservation Email. Attached as Exhibit 237 is a true and correct copy of County of Santa Clara Memorandum, Subject: Review of Responsibility tasks. Attached as Exhibit 238 is a true and correct copy of Declaration of Susana Alcantar. Attached as Exhibit 239 is a true and correct copy of Mr. Hermange's Job Application Submission History. Attached as Exhibit 240 is a true and correct copy of online search results for "Mike Hermange" returning Santa Clara County Personnel Hearing's Finding of Facts - Re the Matter of: Mike Hermange. Attached as Exhibit 241 is a true and correct copy of County of Santa Clara job descriptions for Work Center Manager and for Maintenance Mechanic III. Attached as Exhibit 242 is a true and correct copy of the business card of Carl Coates. Attached as Exhibit 243 is a true and correct copy of emails to Luke Lueng. Attached as Exhibit 244 is a true and correct copy of County of Santa Clara, Policy Against Discrimination, Harassment, and Retaliation. Attached as Exhibit 250 is a true and correct copy of excerpts of Mike Hermange Personnel Board Hearing.

24. I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct and that this declaration was executed on January 1, 2019 at *San Jose, California.*

Michel Hermange

8

Declaration of Michel Hermange in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment — Case No. 16-CV-02847 BLF